UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHONY A. FRANK,<br><br>            Petitioner,<br><br>      v.<br><br>ERIC ARNALD,<br><br>            Respondent. | Case No.  18-cv-03967-EMC<br><br>**ORDER DENYING PETITION FOR**<br>**WRIT OF HABEAS CORPUS** |

## I.      INTRODUCTION

Anthony Frank filed this action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 to challenge his conviction from Santa Clara County Superior Court.  Respondent has filed an answer to the petition, and Mr. Frank has filed a traverse.  For the reasons discussed below, the petition is denied.

## II.      BACKGROUND

A.      The Crimes

The California Court of Appeal described the robberies and the efforts of the police to find the perpetrator:

> A.  March 16, 2011: Counts 1 and 2
>
> Sometime between 11:45 p.m. and midnight on March 16, 2011, Dionizy Slabolepszy and his employee, Shyeeda Ashford were in Ashford's car outside Slabolepszy's business at 3266 De La Cruz Boulevard in Santa Clara.  Slabolepszy was sitting in the front passenger seat.  As Slabolepszy and Ashford were talking, a Pontiac approached them with its high beam headlights on.  The car stopped in front of them and parked about 300 feet away.  Two men exited the car and walked very quickly toward them.  When they were about 20 steps from the car, Slabolepszy saw that they were carrying

handguns "big enough to see in the distance." They were wearing ski masks and heavy, puffy jackets.

Ashford immediately locked the car doors and closed her window. Slabolepszy heard two gunshots and "[p]retty instantaneously" the men ordered them to open the doors and pounded on top of the car.[2] One of the men was on the driver's side and the other was on the passenger side. After Ashford unlocked the doors, the man on the driver's side opened the door, leaned over Ashford, and held his gun on Slabolepszy's neck. Both men demanded that Slabolepszy give them money. Slabolepszy handed $60 to the man on the driver's side. One of the men asked, "What else you got?" Slabolepszy was holding his cell phone. The man on his side hit him in the mouth four or five times with his closed fist in which he was holding a gun. One of Slabolepszy's teeth was knocked out. The man wore gloves, and the handgun was black and not a revolver. Slabolepszy, who was six feet tall, thought this man was one or two inches taller than he was and about 250 pounds.

> [Footnote 2:] Slabolepszy did not know which of the men fired his gun at the car.

Slabolepszy sank down in his seat to avoid the blows and started to lose consciousness. When the man stepped back, Slabolepszy crawled out of the car. After the man on the passenger's side said, "Give me your phone," Slabolepszy threw the cell phone about three or four feet from the man, ran to his office, and called 911.

Police officers found a bullet hole in the front left wheel area of Ashford's car. A spent nine-millimeter Luger casing and a deformed bullet were found from the scene near the car.

B. March 18, 2011: Count 3

On March 18, 2011, Jorge Navarrete responded by e-mail to an ad on craigslist for a HTC Evo cell phone. After an exchange of e-mails, Navarrete spoke to the seller and they agreed on a price of $300. They arranged to meet at 8:00 p.m. at an apartment complex at 1919 Fruitdale Avenue in San Jose. Navarrete arrived at the complex at about 8:05 p.m. After some confusion about which gate was the meeting place, Navarrete drove to another gate. Navarrete identified defendant at trial as the seller.

Navarrete introduced himself to defendant and defendant identified himself as "Kyle." Navarrete asked to see the phone. Defendant replied that he had the phone and asked to see the money. Navarrete invited defendant into his car. Navarrete sat in the driver's seat while defendant, who was holding a plastic shopping bag, sat in the front passenger seat. Defendant did not close the passenger-side door. After Navarrete pulled out $300 in 20 dollar bills, defendant reached into the shopping bag, pulled out a stainless steel or chrome semiautomatic handgun with a black handle, pointed it at Navarrete, clicked it, and demanded the money. Navarrete handed the money to defendant, who then demanded Navarrete's phone. Before giving defendant the phone, Navarrete asked if he could remove the memory card because there were photos and personal information

on it.  Defendant did not allow him to remove it.  As defendant reached for Navarrete's car keys in the ignition, Navarrete grabbed them.  Though defendant told Navarrete that he was going to throw the keys into the bushes, Navarrete refused to hand them over.  Defendant exited the car and ran toward the apartment complex.

Navarrete drove to a nearby 7–Eleven where he used the store phone to call 911.  The parties stipulated that Navarrete was interviewed by the police and described the suspect as a black adult male, mid–30's, six feet five inches tall, weighing 230 to 250 pounds, wearing a black-hooded sweatshirt, black pants, and black shoes with white soles.  Navarrete also provided the police with a copy of the e-mail of the craigslist ad for the phone.  The craigslist ad was placed at 12:12 p.m. on March 18 and the phone number in the ad was 408–386–7340.

On March 18, 2011, San Jose police officers were preparing to conduct a "rolling surveillance" of defendant using a Global Positioning Satellite (GPS) tracking device that had been placed on his white 2009 Pontiac GT with a license plate number of 6GEF303.  At about 8:30 p.m. that evening, Sergeant Gustavo Perez and his team were in the area of Fruitdale Avenue and Leigh Avenue because an armed robbery had been reported.  The suspect of the armed robbery was described as an African–American male between 20 to 30 years of age, six feet five inches tall,[3] heavy build, and wearing a dark-colored hooded jacket and dark pants.

[Footnote 3:]  Defendant is about six feet six inches tall.

Sergeant Perez received information that defendant's car was in the general area of the robbery.  Shortly thereafter, he saw defendant's car in the area of Capitol Avenue and Berryessa and followed it into a shopping center parking lot.  Defendant parked his car in front of a Dollar Tree store.  Sergeant Perez parked a short distance from defendant's car and observed defendant exit his car and enter the Dollar Tree store.  Defendant was wearing a dark-colored hooded sweatshirt and dark-colored sweatpants.  Defendant entered the Dollar Tree store and remained there for five to 10 minutes.  Defendant returned to his car, then exited it while he was holding what appeared to be a cell phone.  Defendant walked over to a trash can, discarded the object, returned to his car, and drove toward Berryessa.  Sergeant Perez directed other members of the surveillance team to continue to keep defendant's car under surveillance.

Sergeant Perez found a Samsung cell phone on top of the garbage in the trash can.  It was raining and the garbage was wet, but the cell phone was clean and dry.  Though the cell phone was missing the SIM card and the battery, the police were able to track the device using the serial number of the phone.  The phone was identified as the phone listed in the craigslist ad with the phone number of 408–386–7340.

Defendant drove to his apartment on 750 North King Road after leaving the shopping center parking lot.  Defendant was eventually taken into custody and police found a black smartphone in his

pocket. Officers performed a sweep of the apartment and found no one else inside.

Later that evening, Navarrete was taken to the scene of defendant's arrest for an in-field identification. Navarrete identified defendant as the person who had robbed him. He stated that he was 100 percent sure that defendant was the robber.

When defendant was interviewed after his arrest, he stated that he was the only person who drove his Pontiac GT on March 18, 2011. He also stated that he was with Steffon Macey that day. The parties stipulated that Macey was interviewed by the Santa Clara police and was identified as an African–American male who was six feet tall and weighed 225 pounds. Appellant stated that he had thrown a cell phone away outside the Dollar Tree store that day because it was out of minutes. Defendant admitted that he owned two handguns.

C. Search of Defendant's Residence

At approximately 4:00 a.m. on March 18, 2011, the police searched defendant's residence pursuant to a warrant. They found a loaded black nine-millimeter Glock semiautomatic handgun and a loaded .40–caliber Sig Sauer semiautomatic handgun in the closet. The Sig Sauer handgun was silver with black grips. The parties stipulated that the nine-millimeter casing and the bullet found at the scene of the robbery at De La Cruz Boulevard were fired from the Glock semiautomatic handgun found in defendant's apartment.

The police found four boxes of ammunition, a "speed loader" for a semiautomatic handgun, two ski masks, and two pairs of gloves in defendant's closet. They also found a pair of black shoes with white soles and a black-hooded sweatshirt. A wallet containing defendant's driver's license and $300 in $20 bills, which were folded together, was found in the closet. There was $81 in a separate compartment of the wallet.

The eye holes of one of the ski masks had a DNA mixture of at least four individuals and at least one of the individuals was male. Defendant was a possible contributor to the major DNA component. The statistical likelihood that the major DNA profile would include defendant as opposed to some unknown individual was one in 480 million individuals in the African–American population.

The eye holes of the other ski mask had a DNA mixture of at least three individuals. Macey was determined to be a contributor to the major component of this DNA.

DNA obtained from one of the gloves located in defendant's apartment was a mixture of at least two individuals and included defendant and Macey as possible contributors of the major DNA component. DNA from the other pair of gloves was a mixture of at least three individuals. Macey was the source of the major DNA component, but the results were inconclusive as to defendant.

4

D.  Telephone Records

The Samsung cell phone (408–386–7340) that defendant threw in the trash can near the Dollar Tree store had been activated on March 18, 2011.  The police seized a Sprint cell phone with the number 408–207–2991 from defendant's apartment.  This phone contained photographs of the cell phone offered for sale in the craigslist ad which was provided by Navarrete.  Telephone records showed that calls were made between 11:42 a.m. and 11:44 a.m. on March 18, 2011, from the Samsung phone to the Sprint cell phone seized from defendant's apartment.  Telephone records also showed calls and text messages on the evening of March 18, 2011, between Navarrete's phone and the defendant's Samsung phone.  A call was made from the Samsung phone to Navarrete's phone at 8:43 p.m. that night.  Both cell phones used the same cell tower, which was in the area of Fruitdale and Leigh near 1919 Fruitdale Avenue.

E.  GPS Records

On February 23, 2011, Officer Alex Gutierrez placed a GPS tracking device on defendant's 2009 Pontiac GT.  At 11:34 p.m. on March 16, 2011, defendant's vehicle was traveling from 74 to 99 Descanso Drive in San Jose.  Between 11:55 p.m. on March 16, 2011, and 12:10 a.m. on March 17, 2011, defendant's vehicle was located in the area of 3200 and 3378 De La Cruz Boulevard near the intersection with Laurelwood Drive in Santa Clara, which was in the area of Slabolepszy's office.  The GPS records indicated that the vehicle travelled between four and six miles per hour.  The records never showed that the vehicle had stopped on De La Cruz Boulevard, but the address remained the same for a full two minutes.

At 8:36 p.m. on March 18, 2011, the GPS records indicated that defendant's vehicle travelled at 14 miles per hour between 1976 and 2149 Fruitdale Avenue in San Jose.  About a minute later, the vehicle was traveling 18 miles per hour between 1900 and 1981 Kingman Avenue.  The vehicle was not moving in the area of 1800 and 1899 Kingman Avenue.  There was no indication that the vehicle went to 1919 Fruitdale Avenue or that it stopped at De La Cruz Boulevard.

The GPS device was programed to record information every minute.  Thus, the GPS readings would not necessarily record a brief stop by the vehicle.

*People v. Frank,* No. H042306, 2017 WL 1093934, *1-4 (Cal. Ct. App. Mar. 23, 2017).

B.  <u>Procedural History</u>

Following a jury trial in Santa Clara County Superior Court, Mr. Frank was convicted of two counts of second degree robbery and one count of shooting at an occupied motor vehicle, and was found to have personally used a firearm in the commission of the robberies.  *See* Cal. Penal Code §§ 211, 212.5(c), 246, 12022.53(b).  Mr. Frank was sentenced to a total of 17 years, four

months in prison.  CT 449-50.

He appealed.  The California Court of Appeal affirmed his conviction in a reasoned decision.  *People v. Frank*, 2017 WL 1093934.  The California Supreme Court denied Mr. Frank's petition for review without comment.  He later filed a petition for writ of habeas corpus in the California Supreme Court that was summarily denied.  *See* Docket No. 22-23.

In his federal petition for writ of habeas corpus, Mr. Frank alleges the following claims: (1) trial counsel provided ineffective assistance in arguing a motion to suppress evidence obtained from a GPS tracking device put on Mr. Frank's car, a protective sweep search of his apartment, and a nighttime search of his apartment; (2) Mr. Frank's *Miranda* rights were violated during his arrest; (3) trial counsel was ineffective in not arguing the *Miranda* issue; (4) the denial of the motion to suppress deprived Mr. Frank of a protected liberty interest and amounted to judicial bias in violation of his Sixth Amendment right to a fair trial; (5) cumulative error; and (6) appellate counsel provided ineffective assistance in failing to properly argue that there was insufficient evidence to support the conviction for shooting into an occupied vehicle.  Respondent has filed an answer and Mr. Frank has filed a traverse.  The matter is now ready for decision.

### III.   JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this action for a writ of habeas corpus under 28 U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the petition concerns the conviction and sentence of a person convicted in Santa Clara County, California, which is within this judicial district.  28 U.S.C. §§ 84, 2241(d).

### IV.   STANDARD OF REVIEW

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

The Antiterrorism And Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to impose new restrictions on federal habeas review.  A petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application

United States District Court
Northern District of California

United States District Court
Northern District of California

1   of, clearly established Federal law, as determined by the Supreme Court of the United States; or

2   (2) resulted in a decision that was based on an unreasonable determination of the facts in light of

3   the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

4       "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court

5   arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if

6   the state court decides a case differently than [the] Court has on a set of materially

7   indistinguishable facts."  *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

8       "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if

9   the state court identifies the correct governing legal principle from [the Supreme] Court's

10   decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.

11   "[A] federal habeas court may not issue the writ simply because that court concludes in its

12   independent judgment that the relevant state-court decision applied clearly established federal law

13   erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Id.* at 411.  "A

14   federal habeas court making the 'unreasonable application' inquiry should ask whether the state

15   court's application of clearly established federal law was 'objectively unreasonable.'"  *Id.* at 409.

16       Section 2254(d) generally applies to unexplained as well as reasoned decisions.  "When a

17   federal claim has been presented to a state court and the state court has denied relief, it may be

18   presumed that the state court adjudicated the claim on the merits in the absence of any indication

19   or state-law procedural principles to the contrary."  *Harrington v. Richter*, 562 U.S. 86, 99 (2011).

20   When the state court has denied a federal constitutional claim on the merits without explanation,

21   and there is no lower state court decision to "look through" to, the federal habeas court "must

22   determine what arguments or theories supported or . . . could have supported, the state court's

23   decision; and then it must ask whether it is possible fairminded jurists could disagree that those

24   arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme]

25   Court."  *Id.* at 102.

26                   **V.**        **DISCUSSION**

27   A.    <u>Ineffective Assistance Of Counsel Claim Regarding The Searches</u>

28       Mr. Frank contends that trial counsel provided ineffective assistance in connection with

7

efforts to suppress evidence obtained by the police.  He contends that counsel failed to adequately argue a motion to suppress evidence obtained from (1) a GPS tracking device attached to his car by the police, (b) a protective sweep search done when he was arrested, and (3) a nighttime search of his apartment following his arrest and the protective sweep.[1]

      1.    Background

The defense moved to suppress data about Mr. Frank's movements obtained from the GPS tracking device, as well as the evidence developed as a result of the information obtained from the GPS tracking device.  A hearing on the motion to suppress was held on April 1, 2014, at which two members of the San Jose Police Department testified and provided the following evidence.

Members of the San Jose Police Department handling a report of a February 5, 2011, attempted robbery at a convenience store learned the license number of the car that had been used in the attempted robbery.  RT 34-36.[2]  Suspecting that the robbers might rob again, the police decided to conduct surveillance of the car to gather information and perhaps catch the robbers during a future robbery.  RT 35.  To keep track of the car, the police placed a GPS tracking device on the underside of the car while it was in a public parking lot on February 23.  RT 36-37, 55-56. The parties stipulated that the car belonged to Mr. Frank and there was no warrant for placement of the GPS tracking device.  RT 27.

The police lieutenant who testified at the suppression hearing stated that, in 2011, he was unaware of any law that required a warrant before a GPS tracking device could be placed on a car. RT 38.  He was aware at the time of the suppression hearing in 2014 that the *United States v. Jones*[3] decision issued in 2012 determined that the placement of a GPS tracking device did require

---

[1] In his federal petition for writ of habeas corpus, Mr. Frank also alleged claims for Fourth Amendment violations, but those claims were dismissed pursuant to *Stone v. Powell*, 428 U.S. 465, 481-82 (1976), which bars federal habeas review of almost all Fourth Amendment claims. Docket No. 13 at 3.  As the Court explained, although the Fourth Amendment "challenges to the searches and evidence obtained therefrom cannot go forward, Mr. Frank's related ineffective assistance of counsel claim can go forward."  *Id.* at 4.

[2] All citations to the reporter's transcript in this section are to the April 1, 2014 transcript, available at Docket No. 22-6.

[3] *United States v. Jones*, 565 U.S. 400, 404 (2012), held that the attachment of a Global–Positioning–System (GPS) tracking device to an individual's vehicle, and subsequent use of that

United States District Court
Northern District of California

1    a search warrant.  RT 38.  He viewed *Jones* as a "paradigm shifting" decision for police in that the

2    police did not need to obtain a warrant to put a GPS tracking device on a car until the *Jones*

3    decision was issued.  RT 43.  The officer who actually attached the GPS tracking device to Mr.

4    Frank's car also testified that he understood in 2011 that a warrant was not required to put a GPS

5    tracking device on a car.  RT 61.

6         The police lieutenant became aware on March 17, 2011, of a robbery that had occurred that

7    day and involved the same sort of vehicle used in the February 5 robbery.  RT 45-46.  The police

8    used data from the GPS tracking device to determine that the car identified in the February 5

9    attempted robbery had been in the vicinity of the March 17 robbery.  RT 47.

10        On March 18, 2011, another robbery took place.  RT 47-48.  Meanwhile, the police who

11   were preparing to conduct surveillance of Mr. Frank's car learned of the robbery.  RT 47-48.  The

12   police followed Mr. Frank (in the car) to a Dollar Tree store and then to his apartment, where they

13   arrested him.  RT 49, 67.  The GPS tracking device stayed on Mr. Frank's car from February 23

14   until his arrest on March 18.  RT 61.

15        In his motion to suppress, Mr. Franks argued that the attachment of the GPS tracking

16   device to his car was a search that was unlawful it was done without a warrant.  CT 249-58.  He

17   also argued that the court should exclude evidence derived from the GPS tracking of his car, as

18   that data had enabled the police to find the car on March 18 and watch him at the Dollar Tree

19   Store (where he dumped a disposable cell phone that linked him to one of the crimes) and to arrest

20   him at his apartment where they found guns and other incriminating evidence.  He further argued

21   that everything obtained in the search of his apartment should be excluded because the GPS data

22   was used to obtain the search warrant that led to the search of his apartment where the police

23   discovered several items of incriminating evidence.

24        The trial court denied the motion to suppress, relying on *People v. Zichwic*, 94 Cal. App.

25   4th 944, 953 (Cal. Ct. App. 2001), which held that placing an electronic tracking device on the

26   defendant's vehicle did not amount to a search within the meaning of the Fourth Amendment.  RT

27

28   device to monitor the vehicle's movements, constitutes a search within the meaning of the Fourth
     Amendment.

77-78. The trial court determined that suppression was not appropriate because, when the police attached the GPS tracking device to Mr. Frank's car a year before *Jones* was decided, they reasonably relied on binding precedent (*Zichwic*) that doing so was not a Fourth Amendment search. RT 78-79. Having found no search for Fourth Amendment purposes, the trial court determined that the argument that the fruits of that search had to be suppressed was moot. RT 79.

        2.      <u>California Court of Appeal's Rejection of the Fourth Amendment Challenge</u>

Mr. Frank asserted on appeal that there had been a Fourth Amendment violation in the placement of the GPS tracking device without a warrant and the use of the data from that tracking device. Although he did not appeal on the ground that he had received ineffective assistance of counsel, the state appellate court's decision on the Fourth Amendment claim informs this Court's analysis of the ineffective-assistance claim.

The California Court of Appeal rejected Mr. Frank's argument that the placement of the GPS tracking device and use of data from it violated his Fourth Amendment rights. The appellate court determined that, when the GPS tracking device was attached, the state of the law was that it was not a Fourth Amendment search. The appellate court acknowledged that the *Jones* decision issued in 2012 had held that the installation and use of a GPS tracking device on a person's vehicle constitutes a search within the meaning of the Fourth Amendment and therefore subject to the exclusionary rule "not only 'when government officers violate a person's 'reasonable expectation of privacy,' but also when a trespass to the defendant's personal property, is 'conjoined with . . . an attempt to find something or to obtain information.'" *People v. Frank*, 2017 WL 1093934, at *5 (quoting *Jones*, 565 U.S. at 406, 408 & n.5). Next, the state appellate court determined that *Jones* did not apply here because *Jones* had not yet been decided when the police attached the GPS tracking device to Mr. Frank's car. *See id.* at *5-6. The state appellate court instead found guidance from another U.S. Supreme Court decision that had held that "'[e]vidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule.'" *Id.* at *5 (quoting *Davis v. United States*, 564 U.S. 229, 241

(2011)).[4]  "Here, when the GPS device was attached and used to monitor [Mr. Frank's] car in 2011, no search warrant was required under state and federal authority."  *Id.* (citing *People v. Mackey*, 233 Cal. App. 4th 32 (Cal. Ct. App. 2015); *Zichwic*, 94 Cal. App. 4th at 953-56; *United States v. McIver*, 186 F.3d 1119, 1126-27 (9th Cir. 1999)).

The California Court of Appeal rejected Mr. Frank's effort to limit *Zichwic* to parolees.[5] As the appellate court explained, *Zichwic* had two alternative and independent holdings, both of which were binding on the court, and the second of which was not limited to parolees.  *People v. Frank*, 2017 WL 1093934, at *5.  The second holding in *Zichwic* was that, even if the defendant was not subject to a parole search condition, "'installing an electronic tracking device on the undercarriage of defendant's truck did not amount to a search within the meaning of the Fourth Amendment.'"  *People v. Frank*, 2017 WL 1093934, at *5 (citing *Mackey*, 233 Cal. App. 4th at 96 (discussing *Zichwic*'s holdings)). The appellate court in Mr. Frank's case also explained that, even if there was no binding California decision, it would not have been unreasonable for police to rely on *McIver*, the Ninth Circuit's 1999 holding that the attachment of a GPS tracking device was not a search within the meaning of the Fourth Amendment.  *People v. Frank*, 2017 WL 1093934, at *6.

Finally, Mr. Frank's argument that *Jones* should be followed because it was not a

---

[4] The *Davis* case explained that the basic purpose of the exclusionary rule was to dissuade the police from ignoring the Fourth Amendment.  "The Fourth Amendment protects the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'  The Amendment says nothing about suppressing evidence obtained in violation of this command.  That rule—the exclusionary rule—is a 'prudential' doctrine, . . . created by [the U.S. Supreme] Court to 'compel respect for the constitutional guaranty.'"  *Davis v. United States*, 564 U.S. 229, 236 (2011) (citations omitted).  The sole purpose of the exclusionary rule is deterrence of future Fourth Amendment violations.  *Id.* at 236-37.  "[S]earches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule."  *Id.* at 231.

[5] In *Zichwic*, the police had attached an electronic monitoring device to the defendant's car at a time when he was on parole and was subject to a parole condition that allowed law enforcement to search him and his property without a warrant.  94 Cal. App. 4th 944, 948–49.  *Zichwic* held that, "if we assume that attaching an electronic tracking device to the undercarriage of defendant's truck constituted a search, it was authorized by defendant's parole search condition.  [¶]  If defendant was not subject to a parole search condition, we would conclude, on the record before us, that installing an electronic tracking device on the undercarriage of defendant's truck did not amount to a search within the meaning of the Fourth Amendment."  *Id.* at 953.

United States District Court
Northern District of California

significant departure from the Supreme Court's existing Fourth Amendment precedents and was

based on rights that had been recognized since the 1700s was rejected by the California Court of

Appeal.  The court explained that, although *Jones* had relied on centuries-old precedent in its

originalist approach to determining the scope of the Fourth Amendment's protections, *Jones* also

had acknowledged that the "reasonable expectation of privacy" had been the focus of the Fourth

Amendment analysis for the last half-century.

> In reaching its holding, the *Jones* court reasoned:  "The Government physically occupied private property for the purpose of obtaining information.  We have no doubt that such a physical intrusion would have been considered a 'search' within the meaning of the Fourth Amendment when it was adopted.  *Entick v. Carrington*, 95 Eng. Rep. 807 (C.P. 1765), is a 'case we have described as a "monument of English freedom" "undoubtedly familiar" to "every American statesman" at the time the Constitution was adopted, and considered to be "the true and ultimate expression of constitutional law"' with regard to search and seizure.  [Citations.]" (*Jones, supra*, 565 U.S. at pp. 404–405.)  However, the *Jones* court also noted that it had focused on an individual's reasonable expectation of privacy since the latter half of the 20th century in determining the scope of the Fourth Amendment.  (*Id.* at pp. 405–406.)  The court explained that the change from the "property-based approach" came with *Katz v. United States* (1967) 389 U.S. 347, where "we said that 'the Fourth Amendment protects people, not places,' and found a violation in attachment of an eavesdropping device to a public telephone booth.  Our later cases have applied the analysis of Justice Harlan's concurrence in that case, which said that a violation occurs when government officers violate a person's 'reasonable expectation of privacy,' [citations]." (*Jones*, at pp. 405–406.)  Thus, police officers would not have reasonably anticipated this shift in Fourth Amendment analysis, particularly in light of federal and state precedent contrary to *Jones*.  Accordingly, the trial court did not err when it denied defendant's motion to suppress evidence.

*People v. Frank*, 2017 WL 1093934, at *6.

　　As mentioned in footnote 1, above, this Court does not review the Fourth Amendment

issues directly, but instead reviews the ineffective-assistance-of-counsel claim regarding the

Fourth Amendment arguments made in the trial court.  Mr. Frank presented his ineffective-

assistance-of-counsel claim in a petition for writ of habeas corpus that was summarily denied by

the California Supreme Court.  Because the state court denied the ineffective-assistance-of-counsel

claim on the merits without explanation, this Court "must determine what arguments or theories

supported or . . . could have supported, the state court's decision; and then it must ask whether it is

possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme] Court." *Harrington*, 562 U.S. at 102.

### 3. Analysis of Ineffective-Assistance-of-Counsel Claim

The Sixth Amendment's right to counsel guarantees not only assistance, but effective assistance, of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The benchmark for judging any claim of ineffectiveness is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Id.* To prevail on a Sixth Amendment ineffective-assistance-of-counsel claim, a criminal defendant must establish two things. First, he must demonstrate that counsel's performance was deficient and fell below an "objective standard of reasonableness" under prevailing professional norms. *Id* at 687-88. Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

"Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986).

A "doubly deferential" judicial review is appropriate in analyzing ineffective-assistance-of-counsel claims under § 2254. *Cullen v. Pinholster*, 563 U.S. 170, 202 (2011). The "question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.

The California Supreme Court's rejection of Mr. Frank's claim was not contrary to, or an unreasonable application of, clearly established federal law.

#### a. The GPS tracking device

Mr. Frank urges that counsel was ineffective in failing to argue that the trial court should grant the motion to suppress the GPS data by following the reasoning in *United States v. Maynard*,

13

615 F.3d 544 (D. C. Cir. 2010), in which the court had found the use of a GPS tracking device to be a search.  Mr. Frank further urges that, by the time *Jones* was decided a year after the GPS tracking device was attached to his car, it was already settled that placing a tracking device on a car would violate the Fourth Amendment, and that the California courts should have disregarded California and Ninth Circuit precedent in favor of *Maynard*.  Docket No. 1-1 at 12-14.  He also argues that counsel was ineffective in failing to argue that the "time in which the GPS device was use[d] went beyond the scope of the allotted time period allowed for this kind of surveillance," *id.* at 11-12, apparently contending that *Maynard* supports a time limit on GPS tracking devices because it found that tracking a suspect for a month violated the Fourth Amendment.  *Id.* at 13-14.  His arguments fail.

First, he is wrong on the facts.  Counsel *did* cite the *Maynard* decision, albeit in the reply brief in support of the motion to suppress rather than in the motion itself.  CT 293.  Counsel argued that the *Maynard* decision had found a search based on a GPS tracking device and showed a split in the circuits.  *Id.*

Second, increased reliance on *Maynard* would not have helped Mr. Frank's cause because although *Maynard* was affirmed in the U.S. Supreme Court's decision in *Jones*, 565 U.S. at 413, its value was low, given that it used a reasoning that the Supreme Court turned away from in *Jones*:  whereas *Maynard* had applied *Katz's* "reasonable expectation of privacy" approach to the Fourth Amendment question, *Jones* later turned away from the *Katz* approach and instead focused on the trespassory nature of the police activity to determine that there was a search.  Counsel would have muddled the picture had he emphasized that both *Maynard* and *Jones* applied to Mr. Frank's case.

Third, regardless of *Maynard*, the trial court was bound to follow a decision that was contrary to *Maynard*.  The *Zichwic* decision from a California Court of Appeal had held that the attachment of a GPS tracking device to a car was not a search for Fourth Amendment purposes.  The trial court was not free to disregard *Zichwic* and reach out to rely on the decision of a federal appellate court located across the country in the District of Columbia.  California courts do not see themselves as bound by the holdings of the Ninth Circuit, or any other federal court other than the

U.S. Supreme Court on Fourth Amendment questions.  *See People v. Bradley*, 1 Cal. 3d 80, 86 (1969) ("although we are bound by decisions of the United States Supreme Court interpreting the federal Constitution, . . . we are not bound by the decisions of the lower federal courts even on federal questions.  However, they are persuasive and entitled to great weight."); *People v. Perez*, 229 Cal. App. 3d 302, 309 (Cal. Ct. App. 1991) (same for California appellate courts); *but cf. Yniguez v. State of Arizona*, 939 F.2d 727, 736 (9th Cir. 1991) ("Despite the authorities that take the view that the state courts are free to ignore decisions of the lower federal courts on federal questions, we have serious doubts as to the wisdom of this view").  Although California courts may look to circuit precedent, they are not bound by it, even as to federal law.  Instead, a California trial court is duty-bound to follow a California Court of Appeal's decision.  "Decisions of every division of the District Courts of Appeal are binding upon all the justice and municipal courts and upon all the superior courts of this state, and this is so whether or not the superior court is acting as a trial or appellate court. Courts exercising inferior jurisdiction must accept the law declared by courts of superior jurisdiction.  It is not their function to attempt to overrule decisions of a higher court."  *Auto Equity Sales, Inc. v. Superior Court of Santa Clara Cty.*, 57 Cal. 2d 450, 455 (Cal. 1962).  In light of this bedrock California rule of stare decisis, the California Supreme Court reasonably could have concluded that it was not deficient performance for counsel to forego an argument to the trial court that it should reject the California Court of Appeal's holding in *Zichwic* and choose instead to follow the D. C. Circuit's holding in *Maynard*.  Indeed, the trial court had to follow the *Zichwic* case that was right on point and was from a panel in the Sixth District Court of Appeal – the same district in which Mr. Frank's appeal was heard.

Fourth, even if the trial court had been willing to consider federal cases, there was a Ninth Circuit case right on point and it also was contrary to the *Maynard* decision.  When the GPS tracking device was attached to Mr. Frank's car in 2011, the Ninth Circuit had the same rule as the California rule.  Before *Jones*, "circuit precedent held that placing an electronic tracking device on the undercarriage of a car was neither a search nor a seizure under the Fourth Amendment," and the government did not violate the Fourth Amendment "when it use[d] an electronic tracking device to monitor the movements of a car along public roads."  *United States v. Pineda-Moreno*,

688 F.3d 1087, 1090 (9th Cir. 2012) (citing *McIver*, 186 F.3d at 1126-27 (9th Cir. 1999), and *United States v. Hufford*, 539 F.2d 32, 34 (9th Cir. 1976)).  In *Pineda-Moreno*, the Ninth Circuit held that, regardless of whether *Jones* would require suppression of GPS data and its fruits today, suppression was not warranted because the agents "objectively relied on then-existing binding precedent" when they attached a GPS tracking device to the defendant's car in a public area in 2007 and then monitored its movements.  688 F.3d at 1091.  The California Supreme Court reasonably could have concluded that it was not deficient performance for counsel to forego arguing for application of *Maynard* in light of California and Ninth Circuit cases that held to the contrary of *Maynard*.

For these same reasons, it would not have been an unreasonable application of clearly established federal law for the California Supreme Court to determine that Mr. Frank had not shown prejudice from counsel's failure to urge that *Maynard* should be followed.  That is, the California Supreme Court could reasonably have determined that, had defense counsel emphasized *Maynard*  in the motion to suppress, there was no reasonable probability of a different outcome on the motion to suppress because the trial court was bound to follow *Zichwic* rather than *Maynard*. *See Wilson v. Henry*, 185 F.3d 986, 990 (9th Cir. 1999) (prejudice not established where it is not reasonable to believe that the motion not made would have been granted if made).

Mr. Franks urges that the GPS tracking device was impermissible because it was attached longer than the device used in *Maynard* that was found to be unlawful.  But for the same reasons as stated above, *Maynard* was out-of-circuit precedent and had found a Fourth Amendment search whereas California authority on point found no Fourth Amendment search.  Thus, the California Supreme Court could reasonably have concluded that there was no deficient performance or resulting prejudice from counsel's failure to argue that the length of time the GPS tracking device was attached to the car showed it to be an unreasonable search.  In other words, the California Supreme Court reasonably could have determined that there was no likelihood that counsel would have succeeded in arguing that the duration of the placement of the GPS tracking device turned a nonsearch into a search.

Mr. Frank also faults counsel for failing to argue that the police knowingly used an expired

1    warrant, *see* Docket No. 28 at 14, 17, but he confuses the facts of another case for his own.  The

2    parties stipulated that there was no warrant to attach the GPS tracking device to Mr. Frank's car.

3    4/1/14 RT 27.  The California Supreme Court reasonably could have determined that counsel's

4    failure to make the factually erroneous argument that the warrant expired was neither deficient

5    performance nor resulted in any prejudice.

6                    b.        The Protective Sweep

7            Mr. Frank's next ineffective-assistance-of-counsel claim relates to a protective sweep of

8    his apartment that was done when he was arrested.

9            A "protective sweep" is "a quick and limited search of premises, incident to an arrest and

10   conducted to protect the safety of police officers or others," that "is narrowly confined to a cursory

11   visual inspection of those places in which a person might be hiding." *Maryland v. Buie,* 494 U.S.

12   325, 327 (1990).  When making an in-home arrest pursuant to a warrant, police officers may "as a

13   precautionary matter and without probable cause or reasonable suspicion, look in closets and other

14   spaces immediately adjoining the place of arrest from which an attack could be immediately

15   launched. Beyond that, however, . . . there must be articulable facts which, taken together with the

16   rational inferences from those facts, would warrant a reasonably prudent officer in believing that

17   the area to be swept harbors an individual posing a danger to those on the arrest scene.  *Id.* at 334.

18           Just moments after receiving a report indicating that Mr. Frank had attempted an armed

19   robbery with a gun, police officers followed Mr. Frank (in his car) to his apartment located on the

20   second floor of a large complex.  After about 40-45 minutes, the police used a loudspeaker to

21   request that Mr. Frank come out of his apartment.  ART 249-50.  Mr. Frank then emerged from his

22   apartment and surrendered; no one else came out of the apartment. RT 289.  After Mr. Frank

23   emerged from his apartment, the police did a protective sweep of the apartment to see if there were

24   other people present and then maintained security of the apartment until it could be turned over to

25   the investigators.  RT 250, 289-90.  The record does not show that any evidence was obtained

26   from the protective sweep.  *See* RT 289-98.  Although Mr. Frank argues in his traverse that the

27   police took guns out of the apartment immediately after his arrest, the only evidence in the trial

28   record is that the two handguns were seized several hours later when the police did a full search of

United States District Court
Northern District of California

17

1    the apartment pursuant to a search warrant.  RT 455, 479.  There is no evidence in the record that

2    any incriminating evidence was seen or seized during the protective sweep.  The application for

3    the search warrant did not mention any information obtained during the protective sweep.  CT

4    260-66.

5         Mr. Frank argues that counsel was ineffective in failing to challenge the protective sweep

6    done at his apartment at the time he was arrested.  Docket No. 1-1 at 4.  He contends that such a

7    search was improper because there was no evidence that anyone was in danger or that exigent

8    circumstances justified the search.  *Id.* at 2-3.

9         Mr. Frank presented this claim in a petition for writ of habeas corpus that was summarily

10   denied by the California Supreme Court.  Because the California Supreme Court denied this

11   ineffective-assistance-of-counsel claim on the merits without explanation, this Court "must

12   determine what arguments or theories supported or . . . could have supported, the state court's

13   decision; and then it must ask whether it is possible fairminded jurists could disagree that those

14   arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme]

15   Court."  *Harrington*, 562 U.S. at 102.

16        It would not have been an unreasonable application of *Strickland* for the California

17   Supreme Court to determine that counsel did not engage in deficient performance by not arguing

18   that the protective sweep violated the Fourth Amendment.  The mechanism used to enforce the

19   Fourth Amendment is the exclusionary rule, *see Davis*, 564 U.S. at 236-37, but there was no

20   evidence to exclude in Mr. Frank's case because none had been seized during the protective

21   sweep.  The California Supreme Court reasonably could have determined that it was within the

22   range of competent attorney representation not to bother filing a motion to suppress based on the

23   protective sweep when there was no evidence that would be suppressed even if a Fourth

24   Amendment violation was shown.  *See Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005)

25   (counsel's performance not deficient for failing to raise meritless objection); *Rupe v. Wood*, 93

26   F.3d 1434, 1445 (9th Cir. 1996) ("failure to take a futile action can never be deficient

27   performance").  The California Supreme Court also reasonably could have determined that, even if

28   counsel had argued that the protective sweep violated Mr. Frank's Fourth Amendment rights, there

United States District Court
Northern District of California

1    was no reasonable probability of a different outcome because there was no evidence to suppress.

2          Mr. Frank argues in his traverse that the police "fabricated" their reports that they took the

3    weapons during the search after they obtained the warrant and instead had located the weapons

4    "right after [he] told them where they were located."  Docket No. 28 at 4.  The California Supreme

5    Court reasonably could have rejected Mr. Frank's argument that the weapons were seized during

6    the protective sweep rather than during the later search pursuant to a warrant due to the absence of

7    any evidentiary support for that argument.  As mentioned above, the only evidence in the record

8    regarding guns was that the guns were seized when the apartment was searched pursuant to a

9    search warrant several hours after the protective sweep was done.  Mr. Frank's ineffective-

10   assistance claim reasonably could have been rejected on the deficient performance prong or the

11   prejudice prong of the *Strickland* test because he established neither.

12         Mr. Frank also argues that a protective sweep was unnecessary because the police had been

13   following him for days using the GPS tracking device so they would have known there was no one

14   else in the apartment.  Docket No. 28 at 6.  This argument is unavailing because there is no

15   evidence he was being actively watched by police before the evening of his arrest and there is no

16   evidence that the GPS tracking device attached to his car provided any evidence as to whether

17   anyone was in the apartment.  Moreover, as explained above, there is no evidence in the record

18   that any evidence was seized during the protective sweep.

19                    c.    The Nighttime Search

20         Mr. Frank next urges that counsel was ineffective in failing to argue that the nighttime

21   search was unlawful under California Penal Code § 1533 because there was not good cause for a

22   nighttime search and because the affidavit for the search warrant did not mention that information

23   had been obtained from a GPS tracking device that was violative of the Fourth Amendment.

24   Docket No. 1-1 at 5-6.  He urges that there was no need for a nighttime search because the

25   protective sweep of the apartment eliminated any threat or danger.  Docket No. 28 at 5.

26         After Mr. Frank was arrested, the police obtained a warrant to search his apartment and to

27   do so at nighttime.  CT 266.  Authorization for nighttime service was requested for the

28   investigation of a fresh robbery committed with a gun.  *Id.*  The application for the warrant stated:

United States District Court
Northern District of California

1   "Because of the ongoing nature of the investigation, the fact that this investigation resulted in the

2   arrest of (S) Frank during the evening hours of this night (3/18/11) and that there is information

3   from (S) Frank that a firearm is located in the residence to be searched, I am requesting night

4   service for execution of this search warrant.  I believe based upon my training and experience and

5   my knowledge of this investigation that evidence related to this crime will be located in the places

6   to be searched and a delay in the execution of this search warrant between the hours of 7:00 AM

7   and 10:00 PM will result in the loss or destruction of evidence related to the investigation of this

8   case." *Id.*

9       Mr. Frank presented his ineffective-assistance-of-counsel claim in a petition for writ of

10  habeas corpus that was summarily denied by the California Supreme Court.  Because the

11  California Supreme Court denied this ineffective-assistance-of-counsel claim on the merits

12  without explanation, this Court "must determine what arguments or theories supported or . . .

13  could have supported, the state court's decision; and then it must ask whether it is possible

14  fairminded jurists could disagree that those arguments or theories are inconsistent with the holding

15  in a prior decision of [the U.S. Supreme] Court."  *Harrington*, 562 U.S. at 102.

16      The California Supreme Court reasonably could have determined that a challenge to the

17  nighttime search would have been futile and therefore Mr. Frank failed to show deficient

18  performance or resulting prejudice.

19      The violation of the statute regarding nighttime searches, California Penal Code § 1533,

20  does not necessarily require exclusion of the evidence obtained during such a search.  The two

21  cases Mr. Frank cites – *People v. Watson*, 75 Cal.App.3d 592 (Cal. Ct. App. 1977), and *Tuttle v.*

22  *Superior Court*, 120 Cal.App.3d 320 (Cal. Ct. App. 1980) – that required suppression when a

23  search did not comply with the statute regarding nighttime searches were no longer good law, as

24  they had been abrogated by Proposition 8.  *See Rodriguez v. Superior Court*, 199 Cal. App. 3d

25  1453, 1468-70 (Cal. Ct. App. 1988) (explaining why *Watson* and *Tuttle* did not survive

26  Proposition 8).  After Proposition 8, "evidence seized in violation of section 1533 should not be

27  excluded if the search is otherwise reasonable in a constitutional sense."  *Rodriguez*, 199 Cal. App.

28  3d at 1470; *cf. Sibrian v. San Bernardino County Sheriff's Dept.*, 526 F. App'x 752, 753 (9th Cir.

United States District Court
Northern District of California

20

United States District Court
Northern District of California

1    2013) (defendants did not violate plaintiff's "Fourth Amendment rights by executing the warrant

2    at night because a violation of California Penal Code § 1533 is not a constitutional violation").  He

3    does not show that the search was not "reasonable in a constitutional sense."  *Rodriguez*, 199 Cal.

4    App. 3d at 1470.

5           Mr. Frank does not show the search was potentially problematic other than that it occurred

6    at nighttime.  His argument that the search was improper because the application relied on

7    information derived from the GPS tracking device fails to persuade because, as discussed above,

8    the use of the GPS tracking device was not a search prohibited by the Fourth Amendment at the

9    relevant time.  His argument that the nighttime search was improper because the protective sweep

10   was not authorized fails because he does not show that anything done or seen during the protective

11   sweep was used to obtain the warrant that permitted a nighttime search.  *See Segura v. United*

12   *States*, 468 U.S. 796, 799 (1984) (police officers' illegal entry into apartment did not require

13   suppression of evidence later discovered at that apartment when executing a search warrant

14   obtained on the basis of information unconnected with the initial entry).

15          The very fact that Mr. Frank argues made the nighttime search unjustified – i.e., the police

16   knew there was no one inside the apartment because they had done a protective sweep of it –

17   showed that a nighttime search would not cause the sort of intrusion against which nighttime-

18   search limitations are designed to protect.  Because there was no one inside the apartment, no one

19   was going to be jostled from peaceful slumber by the police.  *See Tidwell v. Superior Court*, 17

20   Cal. App. 3d 780, 787 (Cal. Ct. App. 1971) ("The failure of the officers to wait until daylight to

21   conduct the search of rooms known to be unoccupied was harmless error and did not require the

22   exclusion of the evidence seized"); *cf. United States v. Ravich*, 421 F.2d 1196, 1201 (2d Cir. 1970)

23   ("The reason for requiring specific authorization of night searches and for the somewhat higher

24   standard of proof for them imposed by Rule 41, namely, the peculiar abrasiveness of official

25   intrusions at such periods, . . . is wholly inapplicable to two unoccupied motel rooms with police

26   officers stationed nearby to ensure that they remained as they were.")

27          It would not have been an unreasonable application of *Strickland* for the California

28   Supreme Court to determine that counsel did not engage in deficient performance by not arguing

United States District Court
Northern District of California

1    that the nighttime search violated the Fourth Amendment.  That court reasonably could have

2    determined that counsel reasonably could have determined that the affidavit in support of the

3    search warrant stated good cause for immediate execution of the search warrant and that it would

4    be futile to move to suppress evidence from the nighttime search based on the fact that the search

5    was done at night.  Counsel could have thought a challenge to the fact the search as done at night

6    was unlikely to succeed because the search warrant application showed "'some factual basis for a

7    prudent conclusion that the greater intrusiveness of a nighttime search is justified by the

8    exigencies of the situation."  *People v. Kimble*, 44 Cal.3d 480, 494 (Cal. 1988).  This would have

9    been a reasonable conclusion, given the search warrant application that reported that Mr. Frank

10    had been arrested that night at his apartment following a robbery at gunpoint he committed that

11    night, the ongoing nature of the investigation, the unknown identity of Mr. Frank's accomplice in

12    the earlier armed robbery, and the risk that the accomplice could flee the jurisdiction or destroy

13    any evidence in his possession if he learned about Mr. Frank's arrest before the police found the

14    accomplice.  Even assuming arguendo that a nighttime search was not justified by the statements

15    in the search warrant application, the California Supreme Court reasonably could have determined

16    that it was within the range of competent attorney representation for counsel not to bother filing a

17    motion to suppress based solely on the nighttime search allegedly being noncompliant with

18    California Penal Code § 1533 when evidence would not have been suppressed on that ground

19    alone.  *See Rodriguez*, 199 Cal. App. 3d at 1470.  It would have been reasonable for the California

20    Supreme Court to conclude that foregoing the filing of a motion that would not lead to the

21    suppression of the seized evidence was not deficient performance and did not result in prejudice.

22    *See Juan H.*, 408 F.3d at 1273 (counsel's performance not deficient for failing to raise meritless

23    objection); *Rupe*, 93 F.3d at 1445 (failure to take a futile action can never be deficient

24    performance).

25         Mr. Frank is not entitled to the writ on his claim that trial counsel provided ineffective

26    assistance regarding the GPS tracking device, the protective sweep, and the nighttime search.

27    B.    The Alleged *Miranda* Violation

28         Mr. Frank contends that his *Miranda* rights were violated when police asked him a

1    question after he was arrested but before he was advised of his *Miranda* rights.  He also urges that

2    his attorney provided ineffective assistance of counsel in failing to raise this point in a motion to

3    suppress.  Docket No. 1-1 at 7.

4    The facts are rather straightforward:  When Mr. Frank was arrested after coming out of his

5    apartment, the police did not promptly advise him of his *Miranda* rights but did ask him where his

6    guns were located.  RT 291-92, 294.  Mr. Frank responded that there was a gun in his apartment.

7    CT 265-66.  His response was included in the affidavit in support of the search warrant but was

8    not admitted as evidence at trial.  CT 265-66; RT 291-92.

9    The California Supreme Court summarily denied Mr. Frank's claims that there was a

10   *Miranda* violation and that counsel provided ineffective assistance in failing to raise the *Miranda*

11   issue.  Because the California Supreme Court denied these claims on the merits without

12   explanation, this Court "must determine what arguments or theories supported or . . . could have

13   supported, the state court's decision; and then it must ask whether it is possible fairminded jurists

14   could disagree that those arguments or theories are inconsistent with the holding in a prior

15   decision of [the U.S. Supreme] Court."  *Harrington*, 562 U.S. at 102.

16   The landmark decision of *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966), requires that a

17   suspect be given certain warnings and must waive those warnings before he may be subjected to a

18   custodial interrogation.  "[U]nless and until such warnings and waiver are demonstrated by the

19   prosecution at trial, no evidence obtained as a result of interrogation can be used against him."  *Id.*

20   at 479; *see also Oregon v. Elstad*, 470 U.S. 298, 306 (1985) ("Miranda exclusionary rule" requires

21   exclusion of unwarned statements in prosecution's case-in-chief but not when used for

22   impeachment).

23   The *Miranda* rule is subject to several exceptions, including the public safety exception,

24   which allows police officers to "ask questions reasonably prompted by a concern for the public

25   safety" before giving *Miranda* warnings.  *New York v. Quarle*s, 467 U.S. 649, 655–56 (1984).  In

26   order for the public safety exception to apply, there must have been "an objectively reasonable

27   need to protect the police or the public from any immediate danger associated with [a] weapon."

28   *Id.* at 659 n.8; *see, e.g., id.* at 657-58 (trial court erred in excluding defendant's statement that "the

United States District Court
Northern District of California

23

United States District Court
Northern District of California

gun is over there" in response to officer's question as to the location of the gun when he caught defendant after a brief chase; "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination"); *id.* at 659-60 (trial court erred in suppressing the gun and subsequent statements by defendant because there was no *Miranda* violation); *United States v. Martinez*, 406 F.3d 1160, 1165-66 (9th Cir. 2005) (officer was entitled to make inquiries about weapons under public safety exception where officer entered the site of a domestic disturbance and, in the process of ascertaining what had occurred, observed the weapons in plain view); *Allen v. Roe*, 305 F.3d 1046, 1051 (9th Cir. 2002) (police officer's post-arrest and pre-*Miranda* questioning of defendant as to location of gun used by defendant in shooting warranted under public safety exception when officer did not know gun's location at time of questioning, gun could be anywhere, and it was reasonably possible that anyone could find the gun and use it).

It would not have been an unreasonable application of clearly established federal law for the California Supreme Court to conclude that there had not been a *Miranda* violation because the question asked of Mr. Frank fit within the public safety exception to *Miranda* identified in *New York v. Quarles*, 467 U.S. at 657-59. The California Supreme Court reasonably could have determined that considerations of public safety justified the officer's failure to provide *Miranda* warnings before asking Mr. Frank about the location of the gun. That court could have thought a question about the location of the gun was justified by the fact that Mr. Frank did not have a gun on his person when he emerged from the apartment, yet the police had followed Mr. Frank (in his car) from an area where he was suspected of committing an armed robbery with a gun and police suspected that two days earlier Mr. Frank had committed an armed robbery with an accomplice during which shots were fired. Given that he was suspected of committing an armed robbery earlier that evening and did not have the gun on his person when arrested, the police reasonably could have been concerned that Mr. Frank had discarded the gun out the window of his car, or while walking from his car to his apartment, or while within the apartment the officers were about to enter to look for an accomplice. The California Supreme Court reasonably could have determined that the gun might have been accessible to Mr. Frank, even though he was now under

United States District Court
Northern District of California

1   arrest, or might have been accessible to someone who found it on the street or in bushes if it had

2   been discarded there.  It would not have been an unreasonable application of clearly established

3   federal law for the California Supreme Court to conclude that there had not been a *Miranda*

4   violation with the question that fit within the *Quarles* public-safety exception.

5       Mr. Frank suggests the question about the location of the gun was unnecessary because the

6   gun was in the apartment.  But the police did not know where the gun was located when the officer

7   asked the question.  The police had followed him from the area where he was suspected of

8   committing an armed robbery and he had returned to his apartment, but that did not necessarily

9   preclude the possibility that he had left the gun in his car, had thrown it out on the street while

10  driving home, or had placed it somewhere outside the apartment – any of which might have

11  created a danger to the public.  "If the gun was discarded in a public place, it posed a continuing

12  immediate danger because anyone could have found the gun at any time.  Moreover, the danger

13  posed by the gun does not dissipate over time."  *Allen*, 305 F.3d at 1051.

14      The California Supreme Court also reasonably could have concluded that there was no

15  *Miranda* violation because Mr. Frank's response to the officer's question was never admitted at

16  trial.  Even when statements are obtained in violation of a defendant's *Miranda* rights, "it is not

17  until their use in a criminal case that a violation of the Self-Incrimination Clause occurs."  *Chavez*

18  *v. Martinez*, 538 U.S. 760, 767 (2003).  The California Supreme Court reasonably could have

19  determined that *Miranda* and its progeny offered no relief to Mr. Frank, given that Mr. Frank's

20  statement to the police that there was a gun in his apartment was not introduced at trial.

21      The California Supreme Court also reasonably could have determined that *Miranda* would

22  not aid Mr. Frank in suppressing the evidence obtained in the search pursuant to the warrant.  The

23  failure to give *Miranda* warnings does not require suppression of the physical fruits of the

24  suspect's unwarned but voluntary statements "[b]ecause the *Miranda* rule protects again violations

25  of the Self-Incrimination Clause, which, in turn, is not implicated by the introduction at trial of

26  physical evidence resulting from voluntary statements."  *United States v. Patane*, 542 U.S. 630,

27  634 (2004).

28

United States District Court
Northern District of California

1    Using similar reasoning, the California Supreme Court reasonably could have rejected Mr.

2  Frank's Sixth Amendment claim that trial counsel was ineffective for failing to raise the *Miranda*

3  issue.  That is, it would have been a reasonable application of *Strickland* for the California

4  Supreme Court to determine that there was not deficient performance by counsel and there was no

5  resulting prejudice from counsel's failure to file a motion to suppress based on the failure to raise

6  the *Miranda* argument because such a motion would have been denied.  *See Strickland*, 466 U.S.

7  at 687-88, 694 (Sixth Amendment ineffective-assistance claim requires defendant to show that

8  counsel's performance was deficient and that he was prejudiced by counsel's deficient

9  performance).  The California Supreme Court's rejection of Mr. Frank's claim of a denial of his

10  right to counsel was not contrary to, or an unreasonable application of clearly established

11  precedent from the U.S. Supreme Court because his pre-*Miranda* admission that there was a gun

12  in the apartment was not used against him at trial.

13    Mr. Frank is not entitled to the writ on the *Miranda* claim or on the ineffective-assistance-

14  of-counsel overlay to that *Miranda* claim.

15  C.    The Claimed Liberty Interest in the Rulings on the Nighttime Search and Suppression

16       Motion

17    Mr. Frank contends that California Penal Code § 1538.5, regarding suppression motions,

18  "creates a liberty interest which is protected by the Due Process Clause of the Fifth and Fourteenth

19  Amendments to the U.S. Constitution, . . . as a result, the denial constituted judicial bias in

20  violation of the Sixth Amendment [right] to a fair trial."  Docket No. 1-1 at 8.  Relatedly, he

21  contends that California Penal Code § 1533, regarding authorization for nighttime searches,

22  creates a liberty interest of which he was deprived.  His argument is muddled but ultimately

23  appears to be that the state court's issuance of a search warrant allowing nighttime service and the

24  state court's denial of his motion to suppress deprived him of a constitutionally protected liberty

25  interest that had been created by the relevant statutes.

26    Mr. Frank presented this claim in a petition for writ of habeas corpus that was summarily

27  denied by the California Supreme Court.  Because the state court denied the claim on the merits

28  without explanation, this Court "must determine what arguments or theories supported or . . .

1   could have supported, the state court's decision; and then it must ask whether it is possible

2   fairminded jurists could disagree that those arguments or theories are inconsistent with the holding

3   in a prior decision of [the U.S. Supreme] Court."  *Harrington*, 562 U.S. at 102.

4       The general rule is that violations of state law are not remediable on federal habeas review,

5   even if state law was erroneously interpreted or applied.  *See Swarthout v. Cooke*, 562 U.S. 216,

6   222 (2011) ("a 'mere error of state law' is not a denial of due process"); *Estelle v. McGuire*, 502

7   U.S. 62, 67–68 (1991) ("it is not the province of a federal habeas court to reexamine state-court

8   determinations on state-law questions").  A federal habeas petitioner may not "transform a state-

9   law issue into a federal one merely by asserting a violation of due process.  We accept a state

10  court's interpretation of state law, and alleged errors in the application of state law are not

11  cognizable in federal habeas corpus."  *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996)

12  (citations omitted).

13      Mr. Frank's claim is a familiar sort of claim, in which a petitioner recognizes that federal

14  habeas relief is not available for a state law error and therefore attempts to turn a state law error

15  into a federal due process violation by asserting that he had a due process right to have the state

16  court follow state law.  His claim rests on a general statement in *Hicks v. Oklahoma*, 447 U.S. 343

17  (1980), that he contends imposes a federal constitutional duty on state courts to comply with state

18  laws.  It is necessary to look at the particular problem at issue in *Hicks* to understand the limited

19  value of that case for habeas petitioners trying to use it as the basis of a due process claim.

20      The Supreme Court observed in *Hicks* that a failure to follow state law might implicate the

21  criminal defendant's federal right to due process.  *Id*. at 346.  In *Hicks*, Oklahoma law provided

22  that a convicted defendant was entitled to have his punishment fixed by the jury.  Hicks' jury had

23  been instructed, in accordance with a habitual offender statute then in effect, that the jury had to

24  assess the punishment at 40 years' imprisonment if it found defendant guilty.  *See Hicks*, 447 U.S.

25  at 344-45.  The jury followed the instruction, imposing the mandatory 40-year term when it

26  returned a guilty verdict.  *Id*. at 345.  Later, the Oklahoma habitual offender statute was declared

27  unconstitutional in a separate case, and that led Hicks to try to set aside his sentence.  The state

28  appellate court rejected Hicks' effort to have his sentence set aside, reasoning that he was not

United States District Court
Northern District of California

1   prejudiced by the impact of the unconstitutional habitual offender statute because his sentence was

2   within the range of punishment that could have been imposed.  *Id.*  The U.S. Supreme Court

3   determined that this analysis was erroneous.  The Supreme Court explained that a convicted

4   defendant was entitled under Oklahoma law to have his punishment fixed by the jury and that,

5   without the unconstitutional statute, the jury could have imposed any sentence of as little as 10

6   years, so it was incorrect to say that the instruction that directed a 40-year sentence did not

7   prejudice the defendant.  *Id*. at 345-46.  The Supreme Court next rejected the argument that this

8   was only a state law error: "It is argued that all that is involved in this case is the denial of a

9   procedural right of exclusively state concern.  Where, however, a State has provided for the

10   imposition of criminal punishment in the discretion of the trial jury, it is not correct to say that the

11   defendant's interest in the exercise of that discretion is merely a matter of a state procedural law.

12   The defendant in such a case has a substantial and legitimate expectation that he will be deprived

13   of his liberty only to the extent determined by the jury in the exercise of its statutory discretion,

14   and that liberty interest is one that the Fourteenth Amendment preserves against arbitrary

15   deprivation by the State."  *Id*. at 346 (citation omitted).

16          It is extremely doubtful that *Hicks* could support habeas relief for the sort of alleged error

17   that occurred here.  To do so would require extending *Hicks* from the sentencing context to the

18   entirely different contexts of the issuance of search warrants and the suppression of evidence at

19   trial.  The Ninth Circuit has rejected a broad reading of *Hicks* that would permit habeas petitioners

20   to characterize various other types of state trial errors in different contexts as federal due process

21   claims.  *See Gonzalez v. Wong*, 667 F.3d 965, 995 (9th Cir. 2011) (observing that petitioner "reads

22   *Hicks* too broadly" by invoking it to support a claim of prosecutorial misconduct during closing

23   arguments) (citing *Chambers v. Bowersox*, 157 F.3d 560, 565 (8th Cir. 1998) (distinguishing

24   *Hicks* and "reject[ing] the notion that every trial error . . . gives rise to a claim under the Due

25   Process Clause")).  A state court's failure to extend a Supreme Court rule to a new context does

26   not support relief under § 2254(d)(1).  *White v. Woodall*, 572 U.S. 415, 426 (2014).  Thus, the

27   California Supreme Court's failure to extend *Hicks* to decisions on search warrants and motions to

28   suppress does not support habeas relief for Mr. Frank.  At the very least, the California Supreme

1 | Court's rejection of the claim was not contrary to, or an unreasonable application of, the holding in

2 | *Hicks*.

3 | Even assuming arguendo that *Hicks* provides clearly established federal law from the U.S.

4 | Supreme Court that a criminal defendant's federal right to due process rights is violated by the

5 | state court's failure to follow state law, Mr. Frank's claim fails because, in denying Mr. Frank's

6 | habeas petition, the California Supreme Court implicitly determined that the magistrate judge did

7 | not in fact err in issuing a nighttime search warrant under California Penal Code § 1533, and the

8 | trial court did not err under California Penal Code § 1538.5 in denying the motion to suppress.

9 | (The search warrant *application* reported that defendant had been arrested that night at his

10 | apartment following a robbery at gunpoint he committed that night, the ongoing nature of the

11 | investigation, the unknown identity of defendant's accomplice in the earlier armed robbery, and

12 | the risk that the accomplice could flee the jurisdiction or destroy any evidence in his possession if

13 | he learned about defendant's arrest before the police found the accomplice.)  A state court's

14 | interpretation of state law, including one announced on direct appeal of the challenged conviction,

15 | binds a federal court sitting in habeas corpus.  *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005).  This

16 | court is bound by the California Supreme Court's determination that the nighttime search warrant

17 | and the denial of the motion to suppress were proper under California law.  There was no *Hicks*-

18 | type due process violation because there was no failure to follow state law.

19 | Ultimately, Mr. Frank's claim is just an attempt to make a state law claim into a federal

20 | one simply by labeling it a "due process" violation.  But a litigant cannot "transform a state-law

21 | issue into a federal one merely by asserting a violation of due process."  *See Langford*, 110 F.3d at

22 | 1389.  That is just what Mr. Frank has attempted to do with his claim that the nighttime search was

23 | improper because the issuing judicial officer did not correctly apply California Penal Code

24 | § 1533's provisions regarding nighttime searches and the trial court failed to correctly apply

25 | California Penal Code § 1538.5's provisions regarding suppression of evidence.  To the extent his

26 | claim is one for state law error, it must be rejected because the Supreme Court has "stated many

27 | times that 'federal habeas corpus relief does not lie for errors of state law.'"  *Estelle v. McGuire*,

28 | 502 U.S. at 67.

1     Mr. Frank further argues that the denial of his motion to suppress under California Penal

2  Code § 1538.5 reflects judicial bias because the ruling was "arbitrary," made "in spite of the

3  controlling authority, and based on the fact that it did not want to set a guilty man free, even if it

4  meant bending the rules." Docket No. 28 at 15. Due process guarantees "an absence of actual

5  bias" on the part of a judge. *In re Murchison*, 349 U.S. 133, 136 (1955). It is well-settled that

6  judicial rulings alone "almost never constitute a valid basis for a bias or partiality motion." *See*

7  *Liteky v. United States*, 510 U.S. 540, 555 (1994) ("opinions formed by the judge on the basis of

8  facts introduced or events occurring in the course of the current proceedings . . . do not constitute a

9  basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that

10  would make fair judgment impossible"). Mr. Frank's factually unsupported assertion that the

11  judge denied his motion due to bias is utterly unpersuasive; his assertion amounts to nothing more

12  than that the trial judge incorrectly decided his motion to suppress, but that does not show judicial

13  bias. *See Liteky*, 510 U.S. at 555. The California Supreme Court certainly could reasonably have

14  determined that judicial bias was not shown in the denial of Mr. Frank's motion to suppress – a

15  denial that was in accord with the analysis of a controlling California Court of Appeal decision

16  (i.e., *Zichwic*) and utilized the same approach as utilized in the Ninth Circuit's decision in *Pineda-*

17  *Moreno*, 688 F.3d at 1091, that held that, regardless of whether *Jones* would require suppression

18  of GPS data and its fruits today, suppression was not warranted because the agents "objectively

19  relied on then-existing binding precedent" when they attached a GPS tracking device to the

20  defendant's car in a public area in 2007.

21     Mr. Frank is not entitled to the writ on this claim.

22  D.   Cumulative Error

23     In some cases, although no single trial error is sufficiently prejudicial to warrant reversal,

24  the cumulative effect of several constitutional errors may still prejudice a defendant so much that

25  his conviction must be overturned. *See Alcala v. Woodford*, 334 F.3d 862, 893–95 (9th Cir. 2003)

26  (reversing conviction where multiple constitutional errors "undermine[d] every important element

27  of proof offered by prosecution"). Here, there were not multiple constitutional errors. Mr. Frank

28  therefore is not entitled to habeas relief under the cumulative error doctrine.

1    E.    Claim for Ineffective Assistance of Appellate Counsel

2         Mr. Frank contends that appellate counsel was ineffective for failing to "properly argue the

3    sufficiency of the evidence did not support the shooting at an occupied vehicle" conviction in light

4    of *In Re. Johnson*, 246 Cal. App. 4th 1396 (Cal. Ct. App. 2016), which had "invalidated the

5    natural and probable consequences theory of aiding and abetting" liability.  Docket No. 1-1 at 14.

6         Mr. Frank presented this claim in a petition for writ of habeas corpus that was summarily

7    denied by the California Supreme Court.  Because the state court denied the claim on the merits

8    without explanation, this Court "must determine what arguments or theories supported or . . .

9    could have supported, the state court's decision; and then it must ask whether it is possible

10   fairminded jurists could disagree that those arguments or theories are inconsistent with the holding

11   in a prior decision of [the U.S. Supreme] Court."  *Harrington*, 562 U.S. at 102.

12        The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant the

13   effective assistance of counsel on his first appeal as of right.  *See Evitts v. Lucey*, 469 U.S. 387,

14   391-405 (1985).  Claims of ineffective assistance of appellate counsel are reviewed according to

15   the standard set out in *Strickland*.  *See Smith v. Robbins*, 528 U.S. 259, 285 (2000).  First, the

16   petitioner must show that counsel's performance was objectively unreasonable, which in the

17   appellate context requires the petitioner to demonstrate that counsel acted unreasonably in failing

18   to discover and brief a merit-worthy issue.  *Smith*, 528 U.S. at 285; *Moormann v. Ryan*, 628 F.3d

19   1102, 1106 (9th Cir. 2010).  Second, the petitioner must show prejudice, which in this context

20   means that the petitioner must demonstrate a reasonable probability that, but for appellate

21   counsel's failure to raise the issue, the petitioner would have prevailed in his appeal.  *Smith*, 528

22   U.S. at 285-86; *Moormann*, 628 F.3d at 1106.

23        The California Supreme Court's rejection of Mr. Frank's claim was not contrary to or an

24   unreasonable application of clearly established precedent from the U.S. Supreme Court.  The

25   California Supreme Court could have reasonably found the claim meritless because Mr. Frank was

26   wrong on the law – contrary to his assertion, the natural-and-probable-consequences doctrine

27   remains a valid theory in California for nonhomicide crimes.

28        Under California law, a person who aids and abets the commission of a crime is considered

a principal in that crime.  Cal. Penal Code § 31.  There are "two distinct forms of culpability for aiders and abettors."  *People v. Chiu*, 59 Cal. 4th 155, 158 (Cal. 2014).  First, a defendant is an aider and abettor if he, "acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." *People v. Beeman*, 35 Cal.3d 547, 561 (Cal. 1984).  Second, an aider and abettor "'is guilty not only of the offense he intended to facilitate or encourage, but also of any reasonably foreseeable offense committed by the person he aids and abets.'" *People v. Prettyman*, 14 Cal.4th 248, 261 (Cal. 1996).  This latter theory is known as the natural-and-probable-consequences doctrine.  *See id.*  In other words, a defendant may be criminally responsible as a direct aider and abettor for the crime he or she intended to abet, and can also be responsible as an indirect aider and abettor for any other crime that is the "'natural and probable consequence' of the target crime."  *Id.*

Mr. Frank faults appellate counsel for not arguing that the evidence was insufficient to support the conviction for shooting into an occupied vehicle under the natural-and-probable consequences doctrine.  He asserts that this would have succeeded because the natural-and-probable consequences doctrine is no longer a valid theory of liability in California.  But he is wrong, as the natural-and-probable-consequences doctrine has been rejected *only* as to premeditated first degree murder.  In *Chiu*, the California Supreme Court invalidated the natural-and-probable-consequence doctrine as to first degree premeditated murder.  *Chiu*, 59 Cal. 4th at 158-59.  *Chiu*'s reasoning is limited to first-degree murders and does not invalidate the doctrine as to any other crime.  *See Chiu*,  59 Cal. 4th at 165-66 ("In the context of murder, the natural and probable consequences doctrine serves the legitimate public policy concern of deterring aiders and abettors from aiding or encouraging the commission of offenses that would naturally, probably, and foreseeably result in an unlawful killing. . . . However, this same public policy concern loses its force in the context of a defendant's liability as an aider and abettor of a first degree premeditated murder."); *People v. Flores*, 2 Cal. App. 5th 855, 869 (2016) (superseded by statute on other grounds) ("We conclude *Chiu* is limited to an aider and abettor's liability on a natural and probable consequences theory for first degree murder, and the animating concerns of *Chiu* are not

United States District Court
Northern District of California

1    sufficiently analogous to extend its application to an aider and abettor's liability on a natural and

2    probable consequences theory for torture."); *People v. Gillespie*, 2019 WL 3980795, at *5-6 (Cal.

3    Ct. App. 2019) (unpublished) (refusing to extend *Chiu* to attempted murder). The *Johnson* case

4    cited by Mr. Frank is not to the contrary because it, like *Chiu*, was a first-degree murder case.

5    Given that Mr. Frank's premise is wrong – contrary to his assertion, the natural-and-probable-

6    consequences doctrine would apply to a conviction of shooting at an occupied vehicle -- it would

7    have been a reasonable application of *Strickland* for the California Supreme Court to determine

8    that there was neither deficient performance nor resulting prejudice when appellate counsel chose

9    not make this unmeritorious argument.

10         The California Supreme Court also reasonably could have determined that there was no

11   deficient performance or resulting prejudice in foregoing the natural-and-probable-consequences-

12   doctrine argument on appeal because it was not the theory of the case at Mr. Frank's trial. The

13   trial court instructed the jury only on direct aiding and abetting and did not instruct on aiding and

14   abetting liability based on a natural-and-probable-consequences doctrine. RT 798-99.[6]  And the

---

16   [6] The trial court instructed the jury that the charge of shooting at an occupied motor vehicle in

17   violation of Penal Code § 246 required the People to "prove that, one, the defendant willfully and
     maliciously shot a firearm and, two, the defendant shot the firearm at an occupied motor vehicle."
     RT 797. The court then instructed the jury on aiding and abetting liability:

18
19         A person may be guilty of a crime in two ways. He or she may have
           directly committed a crime. I would call that person a perpetrator.

20         Two, he or she may have aided and abetted a perpetrator who
           directly committed the crime. A person is guilty of a crime whether

21         he committed it personally or aided and abetted the perpetrator. To
           prove that the defendant is guilty of a crime based on aiding and

22         abetting that crime, the People must prove that, one, the perpetrator
           committed the crime. Two, the defendant knew that the perpetrator

23         attempted to commit the crime. And, three, before or during the
           commission of the crime, the defendant intended to aid and abet the

24         perpetrator to committing [sic] the crime. And, four, the defendant's
           words or conduct did, in fact, aid and abet the perpetrator's

25         commission of the crime. [¶]  Someone aids and abets a crime if he
           or she knows of the perpetrator's unlawful purpose and he or she

26         specifically intends to and does, in fact, aid, facilitate, promote,
           encourage, or instigate the perpetrator's commission of that crime. .

27         . . If all of these requirements are proved, the defendant does not
           need to actually have been present when the crime was committed to

28         be guilty as an aider and abetter [sic]. If you conclude the defendant
           was present at the scene of the crime or failed to prevent the crime,
           you may consider that fact in determining whether the defendant

prosecutor did not urge that the natural-and-probable-consequences doctrine applied, arguing instead that Mr. Frank was guilty on a direct aiding and abetting theory.  RT 815-16.

Appellate counsel does not have a constitutional duty to raise every nonfrivolous issue requested by a defendant. *See Jones v. Barnes*, 463 U.S. 745, 751-54 (1983). The weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy. *See Jones*, 463 U.S. at 751-52.  In light of these principles, it would have been entirely consistent with *Strickland* for the California Supreme Court to reject the ineffective-assistance-of-appellate-counsel claim that was based on the failure to argue a point that was wrong on the law and was not the theory of the case.  Mr. Frank is not entitled to the writ on this claim.

F.       No Certificate of Appealability

A certificate of appealability will not issue.  *See* 28 U.S.C. § 2253(c).  This is not a case in which "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Accordingly, a certificate of appealability is **DENIED**.

### VI.       **CONCLUSION**

For the foregoing reasons, the petition for writ of habeas corpus is **DENIED** on the merits. The Clerk shall close the file.


**IT IS SO ORDERED**.


Dated: November 16, 2020


_____
EDWARD M. CHEN
United States District Judge

---

was an aider and abetter [sic].  However, the fact that a person is present at the scene of a crime or fails to prevent the crime does not by itself make him or her an aider or abetter [sic].

RT 798-99.

United States District Court
Northern District of California